IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY APANOVITCH | ) | CASE NO. 1:91CV2221 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | |
| MARC C. HOUK, WARDEN, | ) | MEMORANDUM OF OPINION |
| | ) | AND ORDER |
| Respondent. | ) | |

On December 14, 1984, Petitioner Anthony Apanovitch ("Petitioner" or "Apanovitch"), was

convicted of one count of aggravated murder in violation of Ohio Revised Code ("R.C.") § 2903.01,

one court of aggravated burglary in violation of R.C. § 2911.11, and two counts of rape in violation

of R.C. § 2907.02.  Mary Anne Flynn was the victim of Apanovitch's crimes.   Apanovitch was

subsequently sentenced to death and 45 to 47 years of imprisonment.

On November 1, 1991, he filed a Petition for Writ of Habeas Corpus (Doc. 1) pursuant to 28

U.S.C. § 2254 in the United States District Court for the Northern District of Ohio.  On July 28, 1993,

the district court dismissed the Petition. (Doc. 48). Subsequently, on December 28, 1993, Petitioner's

and the Respondent Marc C. Houk's ("Respondent"or "State") Motions to Alter Judgment were

denied. (Doc. 55). Petitioner filed his appeal from the district court's decision on January 26, 1994.

(Doc. 57). The Sixth Circuit Court of Appeals, on October 19, 2006, remanded the action for further

adjudication as to Petitioner's claim under *Brady v. Maryland*, 373 U.S. 83 (1963), and the

Respondent's DNA request. *Apanovitch v. Houk*, 466 F.3d 460 (6th Cir. 2006).  Per instructions from

the Sixth Circuit, this Court ordered DNA testing. On February 26, 2009, a hearing was held on the

admissibility of the DNA evidence. The matter now appears before the Court for adjudication.

## I. FACTS

The following facts were taken from the opinion of the Ohio Supreme Court. *State v. Apanovitch,* 33 Ohio St.3d 19, 19-20 (1987).

> On August 23, 1984, after visiting family members, Mary Ann Flynn left to return home. At approximately 10:00 p.m., a neighbor saw Flynn get out of her car and walk toward the back door of her residence. Flynn owned a duplex on Archwood Road in Cleveland, Ohio, and was living in one portion of the unit while renting the other.
>
> Within minutes of Flynn's exiting her car, her tenants and their guests heard a door slam in Flynn's half of the unit. At midnight, they heard a loud bang or thud. One person heard a high pitched noise between 11:30 p.m. and midnight. Thereafter, everything was quiet.
>
> The following day a co-worker and friend, Christine Schenk, became concerned when Flynn failed to report for work at 4:00 p.m. at the Cleveland Metropolitan General Hospital, where she was employed as a nurse and midwife. Schenk telephoned Flynn's brother and together they gained access to Flynn's apartment through the tenants' side of the basement. Martin Flynn discovered the body of his sister in her second floor bedroom. Schenk, who was also a nurse, checked to see if Flynn was alive, and when it was determined that she was not, the police were summoned.
>
> The decedent was discovered lying face down on a mattress with her hands bound behind her back. What appeared to be a rolled-up bedsheet was tied around her neck and also tied to the headboard of the bed.
>
> The cause of death was determined to be asphyxia by cervical compression. Sperm was found in the victim's mouth and vagina. There were wood chips and slivers on the body consistent with pieces of wood found in the bedroom. A laceration was

discovered on the back of the neck and slivers of wood were found in this wound. The body was badly beaten and bruised. The time of death was fixed between midnight and 6:00 a.m.

The police investigation quickly focused on appellant, Anthony Apanovitch. Apanovitch had painted portions of the exterior of the victim's home, and a copy of the contract for the painting was found on Flynn's kitchen table. He indicated to police that he was familiar with the apartment.

Six witnesses testified that Flynn was fearful of Apanovitch, although most of them could only describe him as "the painter" or "a big man" with a "wife that was pregnant." There was conflicting testimony as to what appellant said about the victim. A co-worker, Dawson D. Goetchius, allegedly told detectives that Apanovitch remarked that he would like to have sexual relations with Flynn. However, Goetchius claimed that he only reported that Apanovitch said that she was a nice lady. Appellant apparently asked out many women.

At the time of his arrest, appellant had a scratch on his face consistent with a scratch caused by fingernails. However, there was nothing of significance found in the scrapings taken from the victim's fingernails. Appellant gave conflicting stories as to how he received the scratch, first claiming that a bottle broke and glass flew up and scratched his face. Later, he stated that he was in a fight, although a police investigation failed to establish a fight having taken place where appellant claimed to have received the scratch.

Apanovitch claimed that he was at several bars throughout the evening during various time frames. Some witnesses testified that they did not see him at all at these bars. Others testified that Apanovitch was not in a particular bar or that they did not see him during the time frames he asserted. Appellant was dropped off at the Comet Bar at about 7:00 p.m., the night of the murder. The bartender at the Brookside Inn remembered seeing him at 5:30 p.m. the day of the murder. Appellant left the Brookside Inn between 9:15 and 10:00 p.m., returning to the Inn at approximately 12:45 a.m. the next morning. Apparently he then went to the Escape Lounge, where he arrived at 1:45 a.m.

Appellant's blood group was consistent with the blood group found on the oral and vaginal swabs taken from the victim.

Appellant was indicted on October 2, 1984, by the Cuyahoga County Grand Jury for aggravated murder pursuant to R.C. 2903.01, with two aggravating circumstances (rape and burglary), aggravated burglary pursuant to R.C. 2911.11 with an aggravated felony specification, and two counts of rape pursuant to R.C. 2907.02 with an aggravated felony specification.

-3-

A jury trial was conducted and appellant was found guilty on all counts. During the penalty phase, appellant did not present any mitigating factors listed in R.C. 2929.04(B) or otherwise. Rather, appellant presented further testimony in an attempt to raise a reasonable doubt as to whether he committed the crime. The jury recommended the imposition of the death sentence, and the trial court concurred.

## II. ANALYSIS

The Court has proceeded in accordance with the following instructions set forth by the Sixth

Circuit in *Apanovitch*, 466 F.3d at 489-90:

> Apanovitch continues to raise objections to the state's request, arguing first that the test would be inaccurate and unreliable, and second, that the chain of custody is questionable. It is unclear to us whether any of the DNA material survived the testing, and the exact nature of the test results of the DNA evidence, as well as the chain of custody, remains murky. We suspect that the DNA evidence, should it be introduced and subjected to appropriate evidentiary challenges in court, might help resolve lingering questions of whether Apanovitch suffered actual prejudice when the state withheld the serological evidence, and whether Apanovitch's innocence claim can be verified. We note that Apanovitch could well benefit from any ambiguity or error in the results that might lessen the exact accuracy of any hypothetical match with his own DNA. But these are issues better suited to the district court. Therefore, we reverse the district court with respect to Apanovitch's ninth ground for habeas relief and the state's DNA request, and we remand for that court's further adjudication. In so doing, we note that the district court retains the inherent authority to conduct an evidentiary hearing with respect to the DNA evidence should it deem that course of action to be appropriate.

> We also **REVERSE** the district court's denial of the state's motion to compare the DNA results to the petitioner's DNA, and, accordingly, **REMAND** on this issue as well....On remand, we note that the district court retains the inherent authority to conduct an evidentiary hearing should it determine that further fact development is necessary and appropriate.

Furthermore, in footnote 10, the court stated:

> Of course, it would be inappropriate for us to conduct an evidentiary hearing ourselves, but we believe the district court retains ample inherent authority under a pre-AEDPA standard to conduct an evidentiary hearing on this matter if appropriate, taking the DNA evidence into consideration should that be deemed necessary.

*Id*. at 489. Pursuant to the Sixth Circuit's instructions in its Opinion of October 19, 2006, the Court

-4-

ordered DNA testing. The results favored the State.

A. DNA TEST RESULTS

In 1984, during the autopsy of Flynn, the coroner took swabs from her oral and vaginal cavities which were used to create a number of slides. In 2007, the DNA taken from Apanovitch was sent to Forensic Science Associates ("FSA") for comparison with DNA placed on a slide containing spermatozoa removed from the victim's mouth. The Report from FSA signed by Edward T. Blake and Alan Keel, dated July 20, 2007, stated:

> **Anthony Apanovitch cannot be eliminated** as the source of the spermatozoa from the Mary Ann Flynn oral slide #190729 [Item 2]. The genetic profile shared by Anthony Apanovitch and the source of the spermatozoa from the Mary Ann Flynn oral slide #190729 [Item 2] is expected to occur in approximately one out of 285 million members of the population.

Doc. 106-1 at 9.  The Report defines "population" as "Frequency in Caucasians." *Id*. at 10. Thus, only one in 285 million Caucasians have the same DNA profile as Apanovitch and the sperm found in Flynn's mouth.

Apanovitch's expert, Dr. Norah Rudin, stated in the conclusion to her Report:

> Although the partial DNA profile developed from the sperm cell fraction oral slide L90729 could have come from Anthony Apanovitch (assuming drop-out of an 11 allele at D16S539), the non-sperm fraction is more difficult to interpret. A plain read would suggest that Mary Ann Flynn could not be the source of a sample purportedly taken from her own mouth. However, the indication of a third contributor, as well as types foreign to both Flynn and Apanovitch, combined with the history of the sample, suggest contamination as an explanation for the foreign alleles. Alternate explanations would require a belief that this sperm sample were mixed with non-sperm cells from a woman other than Flynn.

Doc. 110-1 at 7. Dr. Rudin does not address the strength/frequency of the source determination, a calculation necessary in determining whether a comparison has been shown. Both experts agree that the DNA profile of Apanovitch and the spermatozoa taken from Flynn's  oral slide are a match as the

term is defined when making DNA comparisons.

Dr. Rudin contends that the oral slide contains no DNA from the victim so she could not be the source of a sample purportedly taken from her mouth. According to Dr. Rudin, two explanations exist. One would require a belief that the spermatozoa from this sample were mixed with non-sperm cells from a woman other than Flynn, i.e., crime scene or laboratory personnel; the second entails an assumption that historical handling of the slides introduced extraneous DNA, i.e., the chain of custody was broken as the slides were found in a desk drawer during a laboratory reorganization or the case number was marked in two slightly different ways. In other words, Rudin concludes that the slides must have been contaminated. Doc. 110-1 at 6-7.

The 2007 FSA report does not contain a discussion or an analysis of the non-sperm fraction and the reference from Flynn. However, an earlier report from FSA included a comparison of the non-sperm fraction of the oral slide and a DNA profile taken from Flynn's hair. Both contained Flynn's DNA. The Report concluded that the non-sperm fraction of the oral slide, although containing several alleles not attributable to either Flynn or the male spermatozoa, contained DNA compatible with a mixture between Flynn and the spermatozoa source (Apanovitch). Doc 113-1 at 6, 28.[1]

The Court concludes that the weight of the evidence supports a determination that DNA taken from Apanovitch is comparative to the DNA found on the oral slide taken from the victim.

B. CHAIN OF CUSTODY

Apanovitch has challenged the chain of custody of the evidence, consisting of slides of evidence taken from the victim used to make the DNA comparison. The Court finds no merit in this challenge.

─────────────────────

[1]These issues will be discussed in the next section.

-6-

The Sixth Circuit has held that evidence is admissible "when the possibility of misidentification or alteration is 'eliminated, not absolutely, but as a matter of reasonable probability.'" *United States v. Combs*, 369 F.3d 925, 938 (6th Cir. 2004)(quoting *United States v. Allen*, 106 F.3d 695, 700 (6th Cir. 1997)). The chain of custody is part of the authentication requirement set forth in Evid.R. 901. *State v. Brown*, 107 Ohio App.3d 194, 200 (Ohio Ct. App. 1995).[2] The burden of establishing a proper chain of custody is on the state. *State v. Moore*, 47 Ohio App.2d 181, 183 (Ohio Ct. App. 1973). The prosecution has no duty to eliminate every possibility that tampering or substitution occurred. *Id.* Proof of a perfect, unbroken chain is not necessary. *State v. Keene*, 81 Ohio St.3d 646, 662 (1998). The state need only show that it is reasonably certain that substitution, tampering, or alteration did not occur. *Moore,* 47 Ohio App.2d at 183. Any break in the chain of custody affects the weight of the evidence, not its admissibility. *State v. Blevins*, 36 Ohio App.3d 147, 150 (Ohio Ct. App. 1987).

As noted above, this Court held a hearing on Apanovitch's challenge to the chain of custody surrounding the evidence slides. Elizabeth K. Balraj, pathologist and deputy coroner, Cuyahoga County, Ohio, and Coroner at the time of investigation of Marianne Flynn's murder, was the first to testify at the evidentiary hearing. Balraj was the Coroner of Cuyahoga County from July 1987 to July 2007. Her testimony consisted of the general procedures used by the coroner's office when performing an autopsy, as well as her autopsy performance on Flynn's body. Balraj explained as follows. When a body arrives at the coroner's office, it is assigned an identification case number

---

[2]

Questions concerning the admissibility of evidence are usually determined by state law. *Mitchell v. Renico*, 2006 WL 1521752 * 14 (E.D. Mich. May 31, 2006)(citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)). Therefore, the Court will use state law concerning the chain of custody issue.

which remains with the body for any procedure and a case number. Doc. 149 at 16-17.[3]  In performing an autopsy, the pathologist obtains swabs from the mouth, referred to as oral swabs, from the rectum, referred to as rectal swabs, and from the vagina, referred to as vaginal swabs. Tr. 18.  Balraj noted that in 1984, when Flynn's autopsy was performed, the Cuyahoga County Coroner's Office had no DNA technology. *Id.*

Balraj testified that she collected swabs from Flynn. *Id.* She explained that after making smears of the swabs, she would etch the autopsy number on the slides and then etch the type of slide, e.g., "O" for oral.  Flynn's case number was 190729 and her autopsy number was M-51883. Tr. 27.  The swabs would then be rubbed on the glass slides to make a smear of the slides. Tr. 19. The swabs are then put in a paper envelope marked with the case number or autopsy number. *Id.* This envelope is placed in a large manilla envelope. After filling out a requisition form with the pertinent information, Balraj would send the large envelope to the trace evidence department, usually by dumbwaiter. On occasion, a trace evidence scientist would come into the autopsy room to see if there  were any samples, leading to the swabs being directly handed to the scientist. Tr. 20-21. The trace evidence laboratory was at all times a secured department. Tr. 21.The public, therefore, did not have access to the lab. *Id.* Balraj testified that she sent the swabs taken from Flynn to the trace evidence laboratory. She did not see the swabs after that transfer. *Id.*

The trace evidence scientists perform tests to determine the presence of sperm. Tr. 22. The scientist assigned to Flynn's case was Barbara Campbell. Tr. 22. Campbell had been working at the coroner's office for eleven years when she worked on Flynn's case. In October 1989, she took a leave

---

[3]     Doc. 149 is the transcript of proceedings for the evidentiary hearing. Hereafter, it will be cited as Tr.

of absence due to poor health. She had not been coming into work regularly. Tr. 24. Campbell resigned from her position in January 1990. Tr. 23.  Campbell, in fact, passed away well prior to the evidentiary hearing in this matter.

On March 14, 1988, an assistant state public defender sought information about Flynn's laboratory reports. Balraj assigned Linda Luke to search for the requested information. Tr. 25.  Luke was unable to find the requested information at that time. *Id*.  However, on April 18, 1991, Luke notified Balraj that she had found the smears. *Id*.  Luke asked permission to send the smears for DNA testing pursuant to a request that had been made. Tr. 26.  Balraj granted permission and the slides were sent to FSA on April 29, 1991.  Tr. 26.

On cross-examination, Balraj admitted as follows.  In 1984, the coroner's office was not accredited by the American Society of Crime Laboratory Directors. Tr. 28. At that time, there were no written policies or procedures regarding retention of evidence. *Id*. The coroner's office, however, became accredited in 2004. Tr. 29.  Besides the slides made by Balraj, trace evidence scientists made their own slides.  As a result, Balraj could not specify the exact number of slides made in Flynn's case. Tr. 30-31.  She also has no knowledge regarding where trace evidence slides were stored within the department nor the manner in which they were stored. Tr. 31. When asked about whether records were made concerning the removal of trace evidence from the department, Balraj answered that she could not speak to that and that Luke would have knowledge on that topic. Tr. 34.

On redirect, Respondent's counsel referred to the transcript of Barbara Campbell's testimony at Apanovitch's trial wherein she testified that she tested the swabs and found the presence of sperm. Tr. 39. Trial Tr. pg. 826.

Linda Luke, the trace evidence scientist, testified as follows.  Her duties involved the

collection and examination of evidentiary material such as the analyzation of body fluids including blood and sperm. Tr. 43. Luke obtained evidence by walking into the autopsy room and taking it or by using the dumbwaiter system described above. Tr. 44. Luke described the procedure performed in examining evidence, how the evidence was retained, and the system used in 1984 for tracking or logging of items. Tr. 46.

Luke worked with Campbell and was able to recognize her handwriting. Tr. 52. She identified Campbell's handwriting in the record book. Tr. 52. It showed that Campbell found sperm on the vaginal and oral swabs taken from Flynn. Tr. 55-56. She recorded that the slides were "filed in a box, third drawer, left side comparison scope." *Id*. Luke explained that a comparison scope was located on a table which had drawers on both sides of the comparison scope and that slides were routinely stored in those drawers. *Id*. Luke admitted that in 1984, there were no rules or procedures about where slides were to be kept. Tr. 57. However, any items that were permitted to be stored at room temperature were always stored in the trace evidence department, which was always locked. Tr. 58. In 1991, the department hired two new people. When Luke was helping them move a typewriter away from Campbell's desk, she found a key that she recognized in the bottom desk drawer.  Luke used the key to unlock the file drawer near her boss's and found the records of Mary Ann Flynn. Tr. 60. The folder was filed with the name Mary Ann Flynn, and it had on it the case number 190729. Tr. 61. Upon opening the folder, she found a slide carrier that contained a vaginal and two oral slides. *Id*. The slides were marked with Flynn's case number with a diamond point pen. Tr. 62. After finding the slides, Luke called an assistant Cuyahoga County prosecutor.  *Id*. Balraj was also contacted, and it was decided to send the slides for DNA testing. Tr. 63. Luke packaged and shipped the slides to FSA. Tr. 64. FSA returned the slides to the coroner's office. Tr. 68. Since a profile was needed of the victim,

a hair from Flynn was sent with the slides. Tr. 74.

Defense counsel elicited from Luke that the trace evidence department did not have a log in which a trace evidence scientist would make a notation every time the scientist handled a piece of evidence. Tr. 77. The defense also elicited the following testimony.  Luke did not know where Campbell kept the slides, nor did she have knowledge regarding who moved them. Tr. 78. There were no notations that indicated whether someone looked at the slides. Tr.79. FSA referred to case number L90729 instead of 190729. Tr. 82. Wherever the slides were stored, they were kept in locked places. Tr. 84. No record of transfer of the slides within the department was made, nor was there a registry for anyone signing out or returning a key. Tr. 90.

Respondent established on redirect that there was no record of the coroner's office ever receiving liquid semen from Apanovitch at any time. Tr. 91.

Apanovitch called Peter R. DeForest, a professor at the John Jay College of Criminal Justice in New York City, New York. He testified that the chain of evidence is an integral part of criminalistics. "Evidence has to have the integrity before it can be interpreted and explained to others." Tr. 101. DeForest was asked about the American Society of Crime Laboratory Directors which accredits laboratories. Its purpose is to promote the improvement of laboratories through management and the establishment of industry-wide standards. Tr. 102. In order to become accredited, a laboratory must maintain evidence integrity by ensuring that there are policies and procedures in place for handling evidence. Evidence must be properly documented and secured when it comes into the laboratory. Packages must be sealed, recorded and given attention. The final disposition must be documented. Tr. 103. A few states require crime laboratories to be accredited by the American Society of Crime Laboratory Directors. DeForest could only name the State of New York as a state that has

-11-

this requirement. Tr. 104.

The expert witness testified that laboratory keys assigned to anyone must be tracked. *Id*. When an employee assigned a key retires, the key must be returned and documented. *Id*.  Also, a log of entry and exit should be kept. Tr. 104-05. DeForest then explained the importance of proper sealing and packaging. Tr. 106. Without evidence integrity, assumptions would be made about what happened to the evidence at various times, i.e., what might have been done to it, whether it could have been exposed to some untoward events, or whether it could have been compromised or altered in some manner or tampered with by someone. Tr. 109.

According to DeForest, the Cuyahoga County Coroner's Office's procedure for logging in evidence was inappropriate because it was not done chronologically. Tr. 113. Notations about the creation of slides were also allegedly inappropriate. Tr. 114. Further, the number of slides should be noted to create an accurate accounting of the existing evidence. Tr. 115. DeForest concluded that the chain of evidence involving the oral slides taken from Flynn did not meet professional standards in 1994 or today because 1) there are gaps in it, 2) it contained non-contemporaneous note-taking, 3) the insertion of things out of order, and 4) it was missing information about where certain objects were located.  DeForest concluded that these four issues create a reliability problem. Tr. 126.

On cross-examination, Respondent elicited that the American Society of Crime Laboratory Directors only began accrediting in the early 1980s. Tr. 129. The fact that the Cuyahoga County Coroner's Office was not accredited in 1984, therefore, was not unusual. Tr. 128. DeForest admitted that he did not know if there had been any contamination or tampering of the slides in question. Tr. 129-30.

After consideration of all of the testimony elicited at the hearing on this issue, the Court finds

that the Respondent has met its chain of custody burden. There is no evidence of tampering, and according to Apanovitch's expert, any claim of tampering would require significant speculation. Tr. 129-30. Luke testified that there is no indication that any sperm samples from Apanovitch were ever submitted to the Trace Evidence Laboratory. Tr. 91. In fact, Luke stated that she never received a liquid sperm sample from anyone during her time as a trace evidence scientist. *Id*.

Oral, vaginal and rectal slides were made in 1984, although only oral and vaginal slides were found in 1991. This fact is not important in the Court's decision because the rectal slides did not test positive for sperm. The testing was for the purpose of determining the presence of sperm. When sperm was found, a slide was created. If there is no sperm found in a specific location, there is no need to make a slide. Testimony in this regard was presented at the trial. Trial Tr. pg. 827.  Accordingly, the lack of a rectal slide does not cause the Court to question the reliability of the slides that were located.

The slide was labeled 190729 at the coroner's office. Apanovitch claims a break in the chain of custody because FSA considered the slide as labeled L90729.  Such discrepancy does not indicate a break in the chain of custody. The letter "l" or "L" and the number "1" are easily confused. The fact that only the first number is different and that the latter five numbers are consistent leads to the inescapable conclusion that the discrepancy was caused by a simple mistake, not some form of tampering.

The fact that the slides were found in a different locked drawer different than where slides were usually kept does not persuade the Court that tampering occurred. The record demonstrates that the Trace Evidence Department was always locked.  Apanovitch's DNA was found on the slide. His argument regarding tampering would appear to hinge upon a conclusion that someone was able to enter the coroner's office, somehow deposit his sperm on the slide or switch slides that contained his

-13-

sperm, and somehow know that Luke would be opening the drawer that contained the slides.  This scenario is beyond belief.

At the present time, coroner's laboratories have specific procedures designed to protect the integrity of evidence. Such was not the practice when Flynn's case was active. The Cuyahoga County coroner's handling of the evidence fell within the standard operating procedures of the laboratory at that time. There is simply no evidence before the Court to show that any tampering occurred.  While the Court has taken into account DeForest's testimony regarding the *ideal* manner in which evidence should be logged and preserved, the fact that this current-day ideal set of procedures was not followed does not support a finding that the chain of custody was not maintained.

Based upon the above, the Court finds that the evidence submitted at the February 26, 2009 hearing shows a reasonable probability that the chain of custody has not been altered. The DNA evidence taken from Apanovitch is comparative to the DNA found on the oral slide taken from the victim and is properly considered by this Court.

C. *BRADY*

Having found the DNA evidence to be properly considered, the Court examines Apanovitch's *Brady* claim in light of that determination.  In order to succeed on a *Brady* claim, the petitioner must show that: (1) evidence favorable to the petitioner; (2) was suppressed by the State; and (3) that he suffered prejudice as a result. *Strickler v. Green,* 527 U.S. 263, 281-82 (1999). The Sixth Circuit found that the Apanovitch satisfied the first two criteria with respect to the following three issues: (1) a document relating to a police report on statements made by Petitioner; (2) coroner notes concerning an unidentified hair on the victim's body; and (3) documents reflecting that the police knew that the victim was a blood type A secretor. Since the Sixth Circuit held that this Court abused its discretion

-14-

in refusing to grant Petitioner's third motion to expand the record regarding these claims, the materials in question are now part of the record. This Court is now required to determine the third factor, i.e., whether Petitioner suffered prejudice as a result of the State withholding this evidence.

Failure to disclose evidence is material and therefore prejudicial if there is a reasonable probability that had the material been submitted to the defense, the result of the proceeding would have been different. *Id.* at 280, 282. A reasonable probability of a different outcome occurs where the state's suppression of evidence undermines confidence in the outcome of the trial. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The Court in *Kyles* stated: "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. A petitioner need not show that introduction of favorable evidence would have rendered the overall evidence insufficient to convict. *Id.* at 434-35. Materiality is determined by considering the nondisclosed evidence collectively, not individually. *Apanovitch*, 466 F.3d at 475. The combined impact of all of the suppressed evidence must be considered against the totality of the circumstances. *See Kyles,* 514 U.S. at 441. In *Brown v. Head*, 272 F.3d 1308, 1316 (11th Cir. 2001), the Eleventh Circuit held:

> The prejudice component of an ineffective assistance claim and the materiality component of a *Brady* claim both require the same thing: the petitioner must establish that but for the deficient representation or suppression, there is a reasonable probability of a different result in the proceeding. *Compare Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068 with *Kyles v. Whitley,* 514 U.S. 419, 433-34, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995). If the failure to use certain evidence does not result in prejudice for ineffective assistance purposes, the suppression of some of that same evidence will not be material for *Brady* purposes.

*See Joseph v. Coyle*, 469 F.3d 441, 462-623 (6th Cir. 2006), *cert. denied*, 549 U.S. 1280 ("prejudice"

-15-

under *Brady* and *Strickland* is similar).

**1. Police Report**

At trial, an investigating officer testified that Apanovitch "asked me when he's indicated [sic] would I please contact him first rather than just go and arrest him. I guess his mother ha[d] a heart problem so that he could inform his mother first so she would know before he is arrested." Trial Tr. pg. 1446. The State prosecutor represented that there was no record of this conversation. *Apanovitch*, 466 F.3d at 477. In fact, a typed report existed concerning this phone call that indicated that Apanovitch requested that "if" (rather than "when") he was arrested or indicted in connection with this crime, that he be contacted first. *Id*. at 478. Apanovitch argues that he was not anticipating his arrest and indictment. He called the police department to re-assert his innocence, and, in response to the detective's statement that he might be indicted, requested that if he was going to be arrested, that he be given reasonable notice. Apanovitch asserts that his actual statement is an affirmation of innocence, whereas the statement as heard by the jury through the detective served as the rough confession of a man resigned to being caught.

In closing arguments, the prosecutor stated, although not evidence, that Apanovitch, by saying "when," had implicitly confessed. Trial Tr. pg. 2226. He also noted that the detective testified that he was stunned by Apanovitch's statement. Trial Tr. pg. 2488. The detective allegedly would most likely not have made the statement if Apanovitch had or knew of the report. Alternatively, Apanovitch, having the report, would have been able to impeach him if he had made the false statements.

At the time of the alleged statement, Apanovitch knew that he was a suspect. The statement, therefore, standing alone, has little value. Knowing of the investigation, a suspect's use of "when I get indicted" would cause few if any negative inferences. However, the jury could find, based on the

-16-

statement by the detective that he was stunned when Apanovitch said "when" and insisted that there

was no written report, that Apanovitch was admitting some guilt. Apanovitch, therefore, did suffer

some minimal prejudice from the withheld report.

## 2. Coroner Notes

During trial, a lab technician testified that she found a hair that was inconsistent with the

victim's hair or Apanovitch's hair. Tr. pgs. 826, 836. On cross-examination, the lab technician, in

answer to defense counsel's question as to where the hair was found, stated that it was found on the

back of the hand. Trial Tr. pgs. 834-35.  She provided more detail when asked if she personally found

the hair.

> A. Yes, the hands at the time when the body came in, the hands were bound behind the
> back, and they had been covered with plastic bags to protect any evidence that might be
> on them. After removing the plastic bags and looking at the hands is when I noticed the
> one on the *back* portion of the hand, which would have been the upper surface.

Trial Tr. pg. 835. Exhibit D, attached to Respondent's Memorandum in Opposition to Petitioner's *Brady*

Claims (Doc. 120-4), is a photograph of the victim that was introduced at trial showing that the hands

were tied behind her back with her right palm facing out. Trial Tr. pgs. 761-63, State's Exh. 16. This

exhibit shows that the hair was on the base of the right palm.

The State argued that the hair likely became lodged against the outer surface of the victim's hand

during transport. Apanovitch contends that he was unable to refute this testimony because the State

withheld the lab technician's trace evidence report and a police report apparently written after

conversations with the lab technician and detectives. The documents indicated that the hair had been

bound "under the [victim's] bound hands" and "behind the victims [sic] tied hands," *Apanovitch*, 466 F.3d

at 479, which allegedly directly contradicted the lab technician's testimony and also the prosecution's

assertion that the hair could have come from anywhere. Apanovitch further argues that the Sixth Circuit

-17-

held that the State's failure to disclose that the hair was found underneath the victim's bound hands, between her bound hands and her back, is significant for the purposes of a *Brady* analysis.

There appears to be confusion about the location of this hair. Apanovitch contends that the hair was between the bound hands of the victim and her back. If so, it could only have been placed there by the actual perpetrator.  However, the lab technician testified that she considered the backward facing palm of the victim to be the back portion of the hand which would have been the upper surface, Tr. pg. 835. If the body were lying face up at the Coroner's office the hair would have been under her bound hands, i.e., the hair would have been  behind the victim and her hands or between the hands and the gurney. The photographic evidence is consistent with this description. So the hair could have lodged on the hand during transport. Any discrepancies between the trial testimony and the reports would have easily been explained by the examining lab technician. The fact that the technician and or officer may have inartfully used the terms "back," "behind," and "under" does little to nothing to undermine the reliability of the verdict.

**3. Information Concerning the Victim's Secretor Status**

The prosecution failed to disclose that the victim was a blood type A secretor, as is Apanovitch. Since Apanovitch and the victim were both type A secretors, there was no information concerning the blood type of the perpetrator because the recovered evidence could have originated from either of them.

An undisclosed document contains a single handwritten notation by an unknown detective which reads:

SPERM - VICTIM          TYPE A SECRETOR

SUSP.                          TYPE A SECRETOR

Also, the State failed to provide the lab technician's laboratory notes stating that the victim was a

-18-

secretor. Apanovitch argues that this information is material because it contradicts the lab technician's testimony that she had determined the blood type of the perpetrator. By testifying that the perpetrator and Apanovitch had the same blood type, she allegedly relied on this information to link him to the crime. The undisclosed information that both the victim and Apanovitch were blood type A secretors shows that the State did not have any information about the actual perpetrator. According to the testimony, 40-45 percent of the population have blood type A and 80 percent are secretors. Trial Tr. pgs. 828-29, 833-34, 845-47.   The State court of appeals considered this issue stating:

> We note the medical technician limited the importance of the blood type evidence by explaining to the jury that the test results merely failed to exclude Apanovitch from the forty percent of the population who, like the assailant, had type A blood. She expressly informed the jury she had no physical evidence linking Apanovitch to Flynn's death.

*State v. Apanovitch*, 70 Ohio App.3d 758, 760-761(Ohio App. 8th Dist. 1991).

Knowledge of the fact that the victim was a secretor would not have changed the outcome of the trial. The technician, in her testimony, stated that a large number of men had the same blood type and were secretors, but there was no physical evidence linking Apanovitch to the crime. The Sixth Circuit noted that the evidence that the serological evidence linked Apanovitch to the crime was so "extraordinarily weak" that it was "virtually no evidence at all." *Apanovitch*, 466 F3d at 481-82.  The Court's conclusion is consistent with the Circuit.  Informing the jury that the victim was a secretor would have added little, if anything, to the defense in this matter.

**4. Totality of the Circumstances**

Whether or not *Brady* violations exist, the fact that the report from FSA showed the presence of Apanovitch's DNA on the oral slide taken from Flynn supports denial of his habeas. In considering the totality of the circumstances, the Court must consider the DNA test results.  In the order granting

-19-

the state's motion for DNA testing, this Court indicated the potential importance of such testing.

> In the present case, the Court finds that the DNA test results - if a match resulted between DNA found on the victim and Apanovitch's DNA -  would show that even if *Brady* violations occurred, under the totality of the circumstances he has not shown that his trial was fundamentally unfair.  The DNA test results would have the effect of making the *Brady* claims factually false resulting in a windfall to which Apanovitch is not entitled.

Doc. 88 at 5.  Apanovitch, however, contests the authority of this Court to consider the DNA results.

From his argument, it is apparent that Apanovitch does not believe that this Court has the authority to consider the DNA results, in any manner, in resolving his petition.  The Court disagrees. The Circuit made clear that Apanovitch could not evade the review of the DNA results.  "Apanovitch cannot first claim actual innocence before the district court, and subsequently drop those claims, simply to suit his tactical needs[.]" *Apanovitch*, 466 F.3d at 489, n.10.  Furthermore, other courts have considered the inculpatory nature of DNA test results based on tests that were conducted during a habeas proceeding.  *See In re Wright*, 298 Fed. Appx. 342 (5th Cir. 2008).

If the Court were to accept Apanovitch's argument, it would be left in an untenable position. Habeas petitioners would be free to seek additional testing of evidence without any fear of the test results.  Inculpatory results would simply be disregarded in every analysis, yet exculpatory results would be considered in every analysis.  The habeas system is not set up for such gamesmanship. Instead, this Court is asked to determine whether Apanovitch received a trial that resulted in a verdict that is worthy of confidence.  The DNA evidence serves as confirmation that the verdict is worthy of confidence and that Apanovitch suffered no material prejudice from the *Brady* violations.

Furthermore, the Court would deny Apanovitch's petition even without considering the DNA test results.   The withheld information regarding Flynn's secretor status and the location of the hair

-20-

have no exculpatory value.  The jury was made aware that the hair did not belong to Apanovitch and was shown a picture of the location of the hair.  Thus, like the secretor status, that withheld evidence adds nothing to the  Court's review of the totality of the circumstances.  The impact of the withheld police report is minimal.  While the prosecution mentioned Apanovitch's "when" statement, it was an extremely minor part of the overall case.  Instead, the state's case was build on circumstantial evidence.  The Ohio Supreme Court reviewed that evidence as follows:

> This evidence includes the facts that (1) appellant had the same blood type as the perpetrator; (2) he had a scratch on the left side of his face consistent with that of a scratch from a fingernail; (3) appellant could not adequately account for his whereabouts on the night in question; (4) appellant's signed agreement to paint a portion of the victim's house was found on the kitchen table the day after the murder was discovered; (5) appellant was familiar with the peculiar layout of the victim's house; (6) appellant knew the victim and had made statements to others about his desire to have sexual relations with her; (7) the victim was fearful and apprehensive of appellant; (8) appellant spoke with the victim for roughly ten minutes at approximately 4:00 or 4:30 p.m. on the day of the murder. (The subject of the discussion, according to appellant, was the offer to paint the windowsills. A portion of one of the sills was used to stab the victim in the neck.); (9) appellant told the police that it did not mean anything if they found his fingerprints in the house, even though he had painted only the exterior of the house; and (10) appellant offered a variety of inconsistent stories about his whereabouts on the night of the murder.

*Apanovitch*, 33 Ohio St.3d at 23.  None of the above circumstantial evidence is altered by the withheld police report.  Accordingly, the circumstantial evidence that fully supported Apanovitch's conviction remains unchanged and unimpeached by the withheld evidence.  As such, Apanovitch has not demonstrated material prejudice stemming from the withheld evidence, irrespective of the DNA results.  Accordingly, the petition is DENIED.

## III. CONCLUSION

Pursuant to 28 U.S.C. § 2253, the Court must now determine whether to issue Apanovitch a Certificate of Appealability ("COA").  *See Castro v. United States*, 310 F.3d 900, 903 (6th Cir.

2003)(court may decide whether to issue a COA at the same time as the claims for relief are determined). 28 U.S. C. § 2253 provides:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from--
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court
>
> * * *
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

In *Slack v. McDaniel*, 529 U.S. 473 (2000), the Supreme Court stated:

> [t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot,* includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."

*Id.* 529 U.S. at 483-84 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)).

The Court finds that jurists of reason would debate this Court's decision concerning the materiality of the withheld police report and the Court's ruling on the admissibility and weight of the DNA evidence. Therefore, a COA will issue for the first *Brady* issue, i.e., the police report. Further, the Court concludes that jurists of reason would not debate its ruling as to the *Brady* issues concerning the coroner notes and the victim secretor status. A COA is denied as to those issues.

Accordingly, for the foregoing reasons, Apanovitch's Petition for Writ of Habeas Corpus is DENIED. The Petition is hereby dismissed.

The Court hereby issues a COA pursuant to 28 U.S.C. §2253(c) as to the first *Brady* issue (police report) as noted in the above certificate of appealability analysis. The Court finds that none of the other *Brady* issues are debatable among jurists of reason as no other issue comes close to

presenting a federal constitutional or legal violation. The DNA and chain of custody issues do not require a COA as they are intertwined with the *Brady* issues. In the event that a COA is needed for the DNA issue, the Court finds that jurists of reason would debate whether the issue should have been resolved in a different manner.

      IT IS SO ORDERED**.**

Date: <u>August 14, 2009</u>          *<u>/s/ John R. Adams                                             </u>*
                                        JUDGE JOHN R. ADAMS
                                        UNITED STATES DISTRICT JUDGE